# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

HENRY LEE MALBROUGH, Individually
and on behalf of his son, ANTHONY
CAMPBELL

VERSUS

CITY OF RAYNE, ET AL.

CIVIL ACTION

10-107-SDD-CBW

## RULING

This matter is before the Court on the *Re-Urged Joint Motion for Summary Judgment*[1] filed by Defendants, Wayne A. Melancon ("Melancon"), in his official capacity as former Sheriff of Acadia Parish, Louisiana; Acadia Parish Sheriff's Department ("APSD"); Jackie Boddye ("Boddye"), in her official and individual capacities as an Acadia Parish Sheriff's Department Deputy; George Bradford Ware ("Brad Ware"), in his official and individual capacities as an Acadia Parish Sheriff's Department Deputy; the City of Rayne; Officer Christopher Cormier ("Cormier"), in his individual and official capacities as a police officer for the City of Rayne; Chief Carroll Stelly ("Stelly"), in his official capacity as Chief of Police of the City of Rayne; and Joseph Credeur ("Credeur"), in his individual and official capacities as a police officer for the City of Rayne. Plaintiff, Henry Lee Malbrough ("Plaintiff"), individually and on behalf of his son, Anthony Campbell

---

[1] Rec. Doc. No. 116.
50052

("Campbell"), has filed an *Opposition*[2] to this motion, to which Defendants filed a *Reply*.[3] For the reasons set forth below, the Defendants' motion shall be granted.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On February 10, 2009, the Rayne Police Department ("RPD") obtained a search warrant for a residence located at 715 Malvern Avenue in Rayne, Louisiana.    This residence was co-owned by Plaintiff, and his son Campbell lived at this residence. Defendants contend Campbell was "well known to local law enforcement as a drug dealer with numerous prior arrests."[4]    Indeed, on January 11, 2009, one month prior to the incident giving rise to this litigation, Defendants contend Campbell was arrested at the Malvern residence for various charges.    Defendants claim that illegal narcotics were recovered from this residence on January 11, 2009; that Campbell admitted he was selling drugs from the residence; that weapons were also found in the residence; and that multiple persons in the residence at the time were observed attempting to destroy the drugs.[5]  Chief Stelly testified that Campbell attempted to prevent the officers from entering the residence by holding the door shut as the officers tried to enter.[6]

Considering this background, and based on alleged new information from informants that a large shipment of drugs had arrived, the RPD requested assistance from the APSO and the Louisiana State Police ("LSP") in executing the February 10, 2009 warrant.[7]  Defendants maintain that all officers, regardless of agency, were either in

---

[2] Rec. Doc. No. 118.
[3] Rec. Doc. No. 126.
[4] Rec. Doc. No. 116-1 at 14 (p. 5 of memo).
[5] *Id.*
[6] Rec. Doc. No. 116-3 at 37 (Deposition of Chief Stelly).
[7] Rec. Doc. No. 116-4 at 64 (Deposition of Detective Richard T. Gray).

50052

"Class A" regular law enforcement uniforms or apparel with clear insignia indicating they were police officers. The officers arrived at the residence in both marked and unmarked vehicles.[8]

When the officers arrived at the residence, Campbell's 2003 GMC Yukon was parked in the driveway; because of the darkly tinted windows, the officers could not determine if there were occupants in the vehicle. Officers surrounded the vehicle and ordered any occupants to exit. Brian Smith ("Smith") was seated in the passenger seat, and the officers claim he exited immediately from the passenger seat and was handcuffed.[9] Officers then observed Campbell in the driver's seat through the open passenger door. A third occupant, Ricky Monceaux ("Monceaux") was seated in the back seat on the passenger side; however, he remained in the vehicle for the duration of the incident.[10]

Although Defendants claim Campbell was instructed repeatedly to exit the vehicle with his hands up, officers claim he did not comply and began to reach behind the driver's seat for an unknown object.[11] Suddenly, Campbell allegedly put the vehicle in reverse and pressed on the accelerator.[12] Accordingly to the Louisiana State Police Report,[13] Campbell's vehicle struck a RPD patrol unit parked intentionally behind the Yukon to block Campbell's exit, then Campbell put the car in forward and accelerated even though several officers had surrounded the vehicle and were in close proximity to the vehicle

---

[8] Exhibit E (1) at 40, 684-696, 1200-1226.
[9] *Id.* at 40-41.
[10] *Id.* at 43.
[11] Rec. Doc. No. 116-6 at 38-39 (Deposition of Adam Ware).
[12] *Id.* at 37-40.
[13] The Parties stipulated to the authenticity and admissibility of the Louisiana State Police Report along with its attachments. Rec. Doc. No. 84.

50052

based on the small size of Plaintiff's yard.[14]  Campbell then allegedly revved the engine, made a hard left turn, and struck APSO deputy Brad Ware, who was in front of the vehicle screaming for Campbell to exit.[15]

The other Defendants witnessed the Yukon strike Ware and testified that, after Ware was struck, the officers could not see him and believed that he was being dragged underneath the Yukon, which caused three officers to open fire on Campbell.[16]  The Defendants maintain that no officer opened fire until Campbell had disobeyed all police orders, put the Yukon in gear and accelerated towards Brad Ware, and apparently struck Deputy Ware.[17]  It was later discovered that Ware was not dragged by the Yukon or seriously injured, although Ware testified that Campbell knocked him to the ground and "kept coming at [him]," which forced Ware to "get out from underneath in front of the vehicle."[18]  Once out of the way of the Yukon, Ware "jumped up and attempted to stop the vehicle, disable it by shooting out the back tires."[19]  Campbell continued driving out of the Malvern residence and came to a stop in an adjoining block containing a graveyard. At this point, the officers determined that Campbell had been struck by a bullet.[20]

Backseat passenger Monceaux was the only witness to the incident from inside the vehicle, and he essentially confirmed the Defendants' account of the incident. Monceaux gave a recorded statement to police on February 10, 2009, the day after the

---

[14] Exhibit E(1) at 779-795; 804-806, 511, & 850.
[15] Rec. Doc. No. 116-8 at 100 (Deposition of George Ware).
[16] Rec. Doc. No. 116-16 at 67 (Deposition of Adam Ware); Exhibit E(1) at 43-48.
[17] *Id.*; Rec. Doc. No. 116-9 at 72 (Deposition of Brian Smith); Rec. Doc. No. 116-10 at 24 (Deposition of Plaintiff Henry Malbrough); Rec. Doc. No. 116-8 at 105-106 (Deposition of George Ware); Exhibit E(1) Louisiana State Police Report, Statements of Officers Chris Cormier, Joseph Credeur, and Deputy Jackie Boddye, at 43-48.
[18] Rec. Doc. No. 116-8 at 104, lines 1-13 (Deposition of George Ware).
[19] *Id.* at 105, lines 8-9.
[20] Exhibit E(1) Louisiana State Police Report at 40-41.

50052

incident, which was recorded and attached to the Police Report.[21]  The Court listened to Monceaux's February 10 statement several times.  Monceaux told police no less than twenty times that Campbell "ran over the cop."  At the 12:20 mark, Monceaux states that Campbell "reached around the back of the seat like he was trying to hide something."  At the 15:00 mark, Monceaux states it "was all his [Campbell's] fault – they [the police] was doing their job professionally."  Monceaux also stated that both he and Campbell heard the cops "hollering," and "none of the cops were in the wrong."

Several weeks later, Monceaux gave a statement to Plaintiff's counsel on or about March 3, 2009, which was audio recorded and transcribed.[22]  Monceaux was asked to tell what happened from the moment everything started on February 9, 2009.  Monceaux stated:  "we pulled up in the driveway, we sitting right there and we eating some hot tamales and um, they just said something about the cops hitting the house."[23]  Monceaux further explained that Smith made this comment.[24]  Monceaux explained that one cop removed Smith from the vehicle, and another cop came off the porch and pointed a rifle at the windshield, and another cop was at the driver's side door, and "Anthony is reaching behind the seat," to which the office ordered Campbell to "move your hand, move your hand!"[25]  Monceaux also stated that Campbell did not carry a gun; however, he confirmed that Campbell reached behind his seat as the officers approached the vehicle.  Monceaux offered the following narrative:

> And they had another cop come off the porch, in front of the truck, he got a rifle pointed at the windshield. This one at the side door and Anthony is

---

[21] Exhibit E (1), Attachment #8.
[22] Rec. Doc. No. 116-15.
[23] *Id.* at 1.
[24] *Id.*
[25] *Id.* at 2.
50052

reaching behind the seat, but he don't have no gun. The man don't carry no gun. (laughs) And they said move your hand, move your hand! So he moved his hand back to the front, and when he moved his hand, he put it in reverse and he backed, he backed up. He didn't know they had a car behind him, couldn't see, I couldn't see it and I'm sitting in the back seat here and I'm looking around, look, look to see whose around 'cause, 'cause that cop got the gun pointed a foot from us all, leaning in the door. When he went to back up, the cop backed up. They backed out of the door, the door did bump him and when they hit the car, the door slammed closed, and he cut a hard left, dropped it in drive, and I hollered at him, Anthony no, don't do this, don't do it. You know, tell him not to run and um, he laid on the gas, when I heard pop, pop, pop. There three shots. And when I heard the three shots, I heard the glass breaking, I slid to the side, he got bucket seats in the back, I slid in between the bucket seats, put my head behind the seat and pray to god the bullet wouldn't hit me in the head, 'cause I knew they were shooting at the windows, not at the tires. The first three shots, that was the dude, the cop that they hit, that he bumped with the door.[26]

Curiously, however, Monceaux claimed during this interview that he did not see Campbell hit Brad Ware with the vehicle; rather, he stated that he saw "a cop trip and fall in the bushes," but he observed the cop fall on the left side of the bush while the vehicle "caught the right side" of the bush.[27]  Monceaux stated that he did not believe or see Campbell try to threaten a cop or deliberately run anyone over.[28]  Monceaux did confirm that the shooting did not start until Campbell "took a hard left," "stepped on the gas, … and the cop fell in the bushes."[29]  Monceaux again stated:  "When that cop fell down in the bushes, they started shooting."[30]  Although Monceaux did not know the cop that fell, he stated that the cop was taken from the scene in an ambulance, which confirms that Monceaux identified "the cop that fell" as Brad Ware.[31]  Monceaux also stated that "[a]ll

---

[26] *Id.* at 2-3.
[27] *Id.* at 11.
[28] *Id.* at 12.
[29] *Id.*
[30] *Id.* at 13.
[31] *Id.*

50052

the cops were in uniform and they was all in blue,"[32] and he did not see any cops in plain clothes until after the incident was over.

Monceaux was asked by Plaintiff's counsel if he heard the police give Campbell any verbal commands, to which Monceaux responded: "Yep. … Halt, halt … and don't, don't, don't … ."[33] When counsel suggested that an officer had busted the passenger side window before the shooting started, Monceaux explained that "they punched it out after the truck stopped."[34] Counsel asked about the statement Monceaux had given to the police regarding the incident, and Monceaux responded: "I told them the same, he, he backed up, the door bumped that cop and that cop fell in the bushes, I don't know if he run over him or not, you know --" at which point counsel interrupted Monceaux and stated: "Come on now, you, you know nobody run over him you were in the truck."[35] Monceaux responded: "I don't know!"[36] Monceaux was asked if he saw the man go under the truck, to which he responded: "I, well we was so close, the man fell in the bushes and the truck passed right there."[37]

Plaintiff offers a much different version of these events. Plaintiff claims that the Defendants showed up "mostly in unmarked vehicles and, despite their testimony, unmarked uniforms."[38] Plaintiff points to Campbell's deposition testimony, given 6 years after the incident occurred, that Campbell did not know it was a police officer that approached his vehicle on February 11, 2009, and claims Campbell thought he was being

---

[32] *Id.*
[33] *Id.* at 13.
[34] *Id.* at 15.
[35] *Id.* at 16.
[36] *Id.*
[37] *Id.* Plaintiff's counsel raised the issue of Monceaux's drinking problem, which he acknowledged, but Monceaux stated that he was not drunk or doing any drugs on the date of this incident. *Id.* at 16-17.
[38] Rec. Doc. No. 118 at 7.

50052

robbed.[39]  Plaintiff notes that witnesses testified that Officer Adam Ware did not announce that he was a police officer when he approached the Yukon, and Mose Milson ("Milson"), a neighbor who allegedly lived across the street from Malbrough and witnessed the event, testified that he heard an officer threaten Campbell's life before approaching the Yukon.[40] Plaintiff claims Deputy Brad Ware has given inconsistent testimony about his location during the incident and cites to witnesses who testified that Ware was not struck by the Yukon but instead slipped near an air conditioner.   Plaintiff contends that it was unreasonable for the officers to continue to shoot at Campbell after the officers were no longer in the path of the vehicle and they knew that Ware was unharmed.   Plaintiff maintains that Campbell had no idea that police officers were executing a search warrant and that "all he was trying to do was to get away from people point[ing] guns at him with no justification."[41]

Plaintiff filed this lawsuit[42] against Defendants, individually and on behalf of his son, pursuant to 42 U.S.C. §1983 for several alleged constitutional violations, *inter alia*: freedom from excessive use of force; right to life and liberty; right to equal protection; and right to due process, application of law.  Plaintiff also asserts a variety of state law claims. Plaintiff has asserted a "bystander" claim against Defendants for the heart attack he suffered on the day of the shooting.   Defendants have moved for summary judgment on

---

[39] Rec. Doc. No. 102-6 at 7 (Deposition of Anthony Campbell, p. 24).
[40] Rec. Doc. No. 102-4 at 15 (Deposition of Mose Milton, Jr.).
[41] Rec. Doc. No. 118 at 9.
[42] This matter was stayed for several years due to Campbell's medical condition.  It was ultimately determined that it would be unsafe to remove the bullet that remains lodged in Campbell's brain.  Exhibit E(1) at 40-41.
50052

all of Plaintiff's claims, and the Defendants sued in their individual capacities have asserted the defense of qualified immunity to Plaintiff's claims.

## II.    LAW AND ANALYSIS

### A.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[43]  "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[44]  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[45]  If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[46]  However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[47]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a

---

[43] Fed. R. Civ. P. 56(a).

[44] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).

[45] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. at 2552)).

[46] *Rivera v. Houston Independent School Dist.,* 349 F.3d 244, 247 (5th Cir. 2003)(quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).

[47] *Willis v. Roche Biomedical Laboratories, Inc.,* 61 F.3d 313, 315 (5th Cir. 1995)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

50052

reasonable jury could return a verdict for the nonmoving party.'"[48]  All reasonable factual inferences are drawn in favor of the nonmoving party.[49]  However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[50]  "Conclusory allegations unsupported by specific facts … will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations … to get to a jury without any "significant probative evidence tending to support the complaint."'"[51]

### B.  Section 1983 Claims and Qualified Immunity

To state a claim under Section 1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.[52]  Plaintiff alleges that Defendants violated Campbell's Fourth Amendment right to be free from excessive force and his Fourteenth Amendment right to due process.  The Court turns to these claims.

### 1.  Excessive Force

"To prevail on an excessive force claim, a plaintiff must establish: (1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."[53]  The reasonableness inquiry

---

[48] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
[49] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).
[50] *RSR Corp. v. International Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).
[51] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994)(quoting *Anderson*, 477 U.S. at 249).
[52] *See Lefall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir.1994).
[53] *Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008) (internal quotations and citations omitted).
50052

"requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[54]  The key question before the Court based on the facts of this case is whether Campbell "posed an immediate threat to the safety of the officers or others."[55]  The "[u]se of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others."[56]  Courts must "balance the amount of force used against the need for force," paying "careful attention to the facts and circumstances of each particular case."[57]

The Fifth Circuit has held that "[t]he excessive force inquiry is confined to whether the [officer] was in danger at the moment of the threat that resulted in the [officer's] shooting."[58]  Thus, the officers' actions leading up to a shooting are irrelevant for the purposes of an excessive force inquiry in the Fifth Circuit.[59] This Court is bound to consider the "moment of the threat" that resulted in the Defendants' use of deadly force.[60]

Defendants maintain that they surrounded Campbell's vehicle in order to execute a search warrant for the premises, which included the vehicle in question, in police uniforms and/or clothing that clearly displayed law enforcement insignia.  Defendants further contend that, after ordering Campbell out of the car with his hands up repeatedly, he not only failed to comply, but he reached behind the driver's seat for an unknown

---

[54] *Graham*, 490 U.S. at 396.
[55] *Id.*
[56] *Mace*, 333 F.3d at 624.
[57] *Ramirez*, 542 F.3d at 129.
[58] *Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir. 2014), citing *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 493 (5th Cir. 2001).
[59] *See Harris*, 745 F.3d at 772.
[60] *Id.*

50052

object.  Contemporaneously, Campbell is alleged to have quickly backed into the RPD patrol unit parked behind the Yukon in the driveway, revved his engine and made a hard left turn, then put the Yukon in forward and accelerated directly into the path of Brad Ware. The officers testified that they believed that Brad Ware was being dragged underneath the Yukon and that Campbell continued to disobey orders and drive erratically outside the yard before coming to a stop in the graveyard in the adjoining block.  Defendants testified that that shots were not fired until *after* Campbell had refused to exit the car, reached behind his seat, backed into a patrol car, aimed his vehicle and possibly struck Ware, and continued to erratically drive with Ware possibly stuck underneath the vehicle.  Under the circumstances, Defendants maintain that Campbell posed an immediate threat to the safety of the officers and others, Campbell was actively attempting to resist or evade arrest by flight, and the officers reasonably used deadly force at the "moment of the threat."

Plaintiff argues that several genuinely disputed material facts call into question the reasonableness of the officers' conduct during this incident such that summary judgment is not appropriate, and qualified immunity does not shield the officers' conduct.  Plaintiff presents the following alleged disputed facts which he maintains preclude summary judgment:  witnesses to the event have testified that the Defendants were not in uniform and were in unmarked cars when they approached Campbell's vehicle; the officers did not identify themselves as police officers, thus Campbell believed that he was being robbed and was just trying to escape; Milson testified that he heard an officer say prior to the incident that he was going to kill Anthony Campbell when he saw him; there is conflicting testimony about where Brad Ware was located at the time Campbell

50052

accelerated; and there is testimony that Brad Ware was not struck by the Yukon but rather slipped in front of the vehicle.

Plaintiff contends the Court must evaluate whether the Defendants themselves created the situation wherein they had to resort to deadly force - by appearing in plain clothes, mostly unmarked cars, and failing to announce themselves as police officer – as described by the Tenth Circuit in *Allen v. Muskogee*.[61] However, as Defendants note, the law of the Fifth Circuit, not the Tenth Circuit, applies in this case, and the Fifth Circuit has expressly held that, "[i]n this circuit, § 1983 liability cannot be premised on the fact that an officer 'creates the need' to use excessive force by failing to follow police procedure."[62]

### a. *Officers' Clothing/Appearance*

Nevertheless, the Court also finds that Plaintiff has failed to demonstrate an issue of fact regarding the Defendants' appearance on the scene as police officers. Although Plaintiff offers the testimony of Milson,[63] Campbell,[64] and Smith,[65] all deposed more than six years after the incident, that Defendants were in plain clothes and mostly unmarked cars at the time of the incident, Plaintiff's own stipulated evidence undermines this claim. The record reflects that the Parties introduced the Louisiana State Police Report with Attachments as Joint Exhibit 1 for all purposes in this matter.[66] Indeed, Plaintiff and Defendants have heavily cited this Exhibit in briefing the summary judgment motion. The Police Report sets forth that: "Photographs of Sgt. Boddye (as dressed during incident)

---

[61] 119 F.3d 837, 840 (10th Cir. 1997).
[62] *Hover v. Brenner*, 229 F.3d 1147 (quoting *Fraire v. City of Arlington*, 957 F.2d 1268, 1275-76 (5th Cir. 1992)).
[63] Milson was deposed on October 29, 2015, Rec. Doc. No. 102-4.
[64] Campbell was deposed on December 8, 2015, Rec. Doc. No. 102-6.
[65] Smith was deposed on September 1, 2016, over 7 years after the incident, Rec. Doc. No. 102-5.
[66] Rec. Doc. No. 84.
50052

were taken by S/T Frank Garcia and me (S/T Morel)"; [67] "Photographs of Officer Cormier (as dressed during this incident) were taken by S/T Frank Garcia";[68] "Photographs of Officer Adam Ware (as dressed during incident) were taken by S/T Frank Garcia";[69] and "Photographs of Officer Creduer [sic] (as dressed during incident) were taken by S/T Frank Garcia."  The corresponding photographs reflect that Adam Ware was dressed in his "Class A" regular uniform,[70]  Boddye was dressed in khaki pants and a shirt with clear police insignia,[71] and both Cormier and Credeur wore shirts with "RAYNE POLICE" in large block letters across the front.[72]  The record indicates that Deputy Brad Ware was brought straight to the hospital from the scene, and the hospital collected his uniform.[73] In his deposition, Brad Ware confirmed that the photographs of a "Class B" uniform collected at the hospital, depicting his name, badge, and police insignia on both sleeves, are of the uniform he was wearing during the incident.[74]  Trooper Katie Morel testified under oath that the photographs of the officer were taken immediately after the incident at Rayne PD, and the officers were not allowed to go home and/or change.[75]  Moreover, by jointly moving admission of the Police Report and all attachments, Plaintiff has conceded the authenticity and admissibility of the photographs.  Additionally, in both his February 10 and March 3, 2009 statements, Monceaux acknowledged that it was clearly

---

[67] Joint Exhibit E (1) at 44.
[68] *Id.* at 46.
[69] *Id.* at 47.
[70] *Id.* at 691-693.
[71] *Id.* at 688-690.
[72] *Id.* at 684-687; 694-696.
[73] Rec. Doc. No. 116-8 at 132, 150 (Deposition of Brad Ware); Rec. Doc. No. 116-16 at 92-93 (Deposition of Trooper Katie Morel).
[74] Rec. Doc. No. 116-8 at 150 (Deposition of Brad Ware); Exhibit E(1) at 1200-1226.
[75] Rec. Doc. No. 116-16 at 121 (Deposition of Katie Morel).
50052

police officers that surrounded Campbell's vehicle, and Malbrough testified that there were marked police cars at the scene as well as some officers in uniform.[76]

In *Green v. Entrekin*,[77] the district court for the Western District of Louisiana addressed a suit brought by a plaintiff alleging several constitutional violations pursuant to Section 1983, including unlawful arrest and excessive force. The plaintiff argued that she ignored the officer's traffic orders in part because he did not identify himself as a police officer, and she could not tell from his clothing that he was a police officer as his reflective vest allegedly concealed his badge and name tag.[78] The Court rejected this contention, finding that the plaintiff failed to demonstrate a fact issue based on the photographs submitted by the defendants:

> [P]hotographs submitted by the defendants show that the reflective vest did not cover the sleeves on Officer Entrekin's uniform, both of which have SPD insignias. *See* Record Document 26, Ex. 17. Additionally, Green encountered Officer Entrekin directing traffic at the intersection of a major highway and an interstate near the location of the state fair.
>
> The court finds that, under the circumstances, it was reasonable for Officer Entrekin to conclude that Green knew he was a police officer, **even assuming that she truthfully did not know that he was**.[79]

This conclusion by the *Green* court is critical: the question is not whether Campbell truthfully knew that the individuals surrounding his vehicle were officers; rather, the question is, based on the record evidence of their attire on the date of the incident, the officers reasonably concluded that Campbell knew or should have known they were police

---

[76] Rec. Doc. No. 116-10 at 14 (Deposition of Henry Malbrough).
[77] 2014 WL 4277952 (W.D. La. Aug. 28, 2014).
[78] *Id.* at * 5.
[79] *Id.* at *5-6 (emphasis added).

50052

officers under the circumstances.[80]

Indeed, when ruling on a motion for summary judgment, the Court evaluates the evidence in the light most favorable to the nonmovant and does not weigh evidence or judge credibility.[81] Nevertheless, any factual disputes raised by Plaintiff must be genuine.[82] Where a video recording, or conceivably some other unquestionable form of evidence, contradicts a plaintiff's recollection to such a degree that no reasonable juror could credit the plaintiff's testimony, the court must accept the facts as shown in the recording.[83] Based on the photographic evidence submitted and stipulated to by all Parties in this matter, the Court finds that the photographs of the officers in the Police Report establish unquestionably that the Defendants were dressed in a manner by which it was reasonable for them to conclude Campbell knew or should have known they were police officers at the time he was ordered to exit the vehicle.

### b. Reaching for an unknown object

The testimony of officers on the scene and the statement given by Monceaux, who was the only witness in the vehicle at the relevant time, established that Campbell reached behind his seat after the officers advised him to exit the vehicle. The evidence that Campbell reached behind his seat is uncontroverted. Whether Campbell owned a gun, carried a gun generally, or was reaching for a gun at that moment is irrelevant to the question before the Court. The Fifth Circuit has repeatedly found an officer's use of

---

[80] *See also Lewis v. City of Shreveport*, 2018 WL 1162987 at *6 (W.D. La. Mar. 5, 2018)(Court rejected plaintiff's argument that he did not know arresting officers were police officers where photographic evidence established the officers were wearing gray polo shirts with the Shreveport Police emblem on each shoulder and black tactical vests with "POLICE" written in white letters across the front and back.).
[81] *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009).
[82] *J & J Sports Prod., Inc. v. Mandell Family Ventures, L.L.C.*, 751 F.3d 346, 347–48, 2014 WL 1757307, at *1 (5th Cir. May 2, 2014).
[83] *Scott v. Harris*, 550 U.S. 372, 378–79 (2007).

50052

deadly force to be reasonable when "a suspect moves out of the officer's line of sight such that the officer could reasonably believe the suspect was reaching for a weapon."[84]

### c. Alleged threat to kill Campbell

Plaintiff is likewise not aided by the deposition testimony of Milson, almost six years after the incident, that he observed a pickup truck "with some white boys" stop in front of Plaintiff's house on the date in question.[85]  Milson testified that he heard an unidentified "little short fellow … say 'When I see that son of a bitch, I'm going to kill him.' He was talking about Anthony."[86]  This testimony is insufficient to create an issue of fact as to use of force reasonableness for several reasons.  First, Milson does not know who made this alleged statement; Milson admitted that he did not provide this statement to the police when he was interviewed soon after the incident because he only remembered it "when [he] was talking" in the deposition taken on October 29, 2015,[87] over six years after the incident and a week after Milson was visited by Campbell.[88]  Further, Milson speculates that this alleged statement was made in reference to Anthony, although the alleged statement itself contains no specific reference.

The Court listened to the audio recording of the statement given to the police by Milson on March 4, 2009.  In this statement, given less than a month after the incident

---

[84] *Manis v. Lawson*, 585 F.3d 839, 844 (5th Cir. 2009) (collecting cases)(In reviewing the district court's grant of summary judgment, the Fifth Circuit found that the appellees on behalf of Manis failed to dispute "the only fact material to whether [the officer] was justified in using deadly force: that Manis reached under the seat of his vehicle and then moved as if he had obtained the object he sought." *Id*. Plaintiffs presented no evidence that called the officer's statements into question. *Id.* at 845.  The court held that "Manis's actual intention—if, indeed, that could be discerned—is not the test. The question is whether in view of Manis's conduct, [the officer] was objectively reasonable in believing Manis posed a threat of serious harm." *Id.*).
[85] Rec. Doc. No. 102-4 at 14, lines 24-25. (Deposition of Mose Milson, Jr.).
[86] *Id.* at 15, lines 3-6.
[87] *Id.* at 70, line12.
[88] *Id.* at 65-66.
50052

occurred, Milson is specifically asked what he heard the officers say, and this alleged statement of a threat to kill Campbell is not mentioned at all. Moreover, although Milson states initially in the interview, as he testifies later in his deposition, that the officers did not arrive on the scene in marked vehicles or police attire, at the 2:55 mark of the recording, the interviewer asks Milson how he knew it was cops, and he replied that he could see "COPS" written on the car. While the Court may not make credibility determinations at the summary judgment stage, the Court "need not permit a case to go to a jury … when the inferences that are drawn from the evidence, and upon which the non-movant relies, are "implausible."[89] Furthermore, "[e]ven where facts are disputed, the nonmoving party must offer evidence to enable a reasonable jury to return a verdict in its favor."[90] The Court must be satisfied "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor."[91] The Court finds that Milson's testimony as to the "fact" of an alleged threat to kill Campbell implausible and insufficient to reach a jury.[92]

Nevertheless, the Court finds in the alternative that, even accepting Milson's testimony as true, such a statement does not change the fact that the uncontroverted evidence in this case shows that no officer opened fire on Campbell's vehicle until after he had refused to obey orders, he reached behind his driver's seat, he aimed the vehicle in the direction of Brad Ware, the officers believed Brad Ware was being dragged under

---

[89] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 592-94 (1986).

[90] *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001), *superceded in part on other grounds by* Fed. R. Civ. P. 37(e).

[91] *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir.1990); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.

[92] *See also Price v. Worldvision Enterprises, Inc.*, 455 F.Supp. 252, 266 n. 25 (S.D.N.Y. 1978)("Issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is 'too incredible to be believed by reasonable minds.'")(internal citations omitted).

50052

the vehicle, and Campbell continued to accelerate the vehicle. The evidence demonstrates that at no time did Campbell comply with police orders or stop his attempted flight. Thus, Milson's testimony does not create an issue of fact as to the reasonableness of the force used.

### d. Campbell's testimony

Campbell testified that he recalled nothing at all after he placed the vehicle in reverse.[93] Because the uncontroverted evidence establishes that the officers did not open fire until after the vehicle accelerated forward and ostensibly struck Brad Ware, Campbell's testimony fails to demonstrate a materially disputed fact regarding the objective reasonableness of the officers' use of force.

### e. Brad Ware's position during the incident

Plaintiff also contends there are genuine issues of material fact regarding the location of Brad Ware at the time Campbell accelerated his vehicle and whether Campbell's vehicle actually struck Brad Ware or he slipped near the vehicle. Plaintiff claims Adam Ware testified that he saw Brad Ware leave the house and approach the vehicle as it was backing up;[94] yet, Plaintiff claims Brad Ware testified that he was in the house when he heard the crash of Campbell backing into the police car,[95] and several other officers testified that Campbell immediately put the car in drive and accelerated and turned left. Thus, Plaintiff contends the timing creates an issue of fact because Brad Ware did not have time to place himself in front of Campbell's vehicle when it began

---

[93] Rec. Doc. No. 102-6 (Deposition of Anthony Campbell at 37-38).
[94] Rec. Doc. No. 102-10 at 49 (Deposition of Adam Ware, p. 49).
[95] Rec. Doc. No. 102-11 at 99 (Deposition of Brad Ware, p. 99).
50052

moving forward if he was still in the house when Campbell backed into the police car. The Court disagrees.

Notwithstanding the fact that the Court does not see the conflict between the testimony of Adam Ware and Brad Ware, the stipulated photograph of the residence and driveway reveals that Brad Ware could have exited the back door and would have been immediately in front of the vehicle within one or two steps.[96] Brad Ware testified that he was at the back door.[97] The photographic evidence undermines Plaintiff's claim that it would have taken too much time for Brad Ware to exit the house when he heard the crash and place himself in front of the vehicle when Campbell began accelerating. Moreover, Adam Ware testified that, between Campbell backing into the police car and "before he jammed it back in drive … there was a time delay between when he saw Brad in front of the vehicle … ."[98] In the LSP Report, Officer Lance Arsement reported that, after Campbell put the vehicle in reverse and hit the police car, "[h]e then tried to go but the truck would not move. Campbell finally manipulated the shift into drive, accelerated forward and struck Deputy Brad Ware."[99] This alleged discrepancy in testimony about Brad Ware's location is not material to the question before the Court and is, in the Court's view, not a discrepancy.

It is likewise irrelevant whether other witnesses or bystanders claim that Brad Ware fell near the bushes rather than being struck by Campbell's vehicle. The uncontroverted facts establish that shooting did not start until Ware had fallen, ostensibly beneath the

---

[96] Joint Exhibit E (1) at 805.
[97] Rec. Doc. No. 102-11 at 85 (Deposition of Brad Ware, p. 85, lines 8-11).
[98] Rec. Doc. No. 102-10 at 50 (Deposition of Adam Ware, p. 50, lines 6-8).
[99] Joint Exhibit E (1) at 48.
50052

vehicle, and the officers' perception of what happened is relevant to the reasonableness of the force used. Once it was announced that an officer was down, it was objectively reasonable for the officers to respond with force in light of the circumstances. As the Fifth Circuit instructs, "[a]n officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others. The question is one of 'objective reasonableness,' not subjective intent, and an officer's conduct must be judged in light of the circumstances confronting him, without the benefit of hindsight."[100]

### f. Alleged prolonged shooting

Finally, Plaintiff maintains that the officers continued shooting after Campbell and/or his vehicle were no longer a threat, and this constitutes excessive force. This claim is likewise without merit. The testimony of witnesses to this event was wide-ranging in both the number of shots witnesses heard fired and the length of time the officers allegedly fired at Campbell's vehicle. Plaintiff claims that the "vast majority" of the shots were fired after Brad Ware was up and off the ground and shooting at Campbell's vehicle.[101] Plaintiff cites to the deposition testimony of Smith;[102] however, in the pages cited by Plaintiff, Smith does not offer testimony to this effect.

In *Plumhoff v. Rickard*, the United States Supreme Court considered a Section 1983 action brought by the estate of a suspect who was killed by police officers in a high-speed car chase.[103] The Court held that the officers acted reasonably in using deadly

---

[100] *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)(internal citations omitted).
[101] Rec. Doc. No. 118 at 8.
[102] Rec. Doc. No. 102-5 at 25-28 (Deposition of Brian K. Smith).
[103] 572 U.S. 765 (2014).
50052

force in an attempt to terminate a dangerous high-speed car chase that threatened the lives of innocent bystanders. Like Plaintiff herein, the claim was made that, even if the use of deadly force was permissible, firing a total of 15 shots was unreasonable. The Court rejected this argument, finding: "It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended."[104] The Court noted that,

> during the 10–second span when all the shots were fired, Rickard never abandoned his attempt to flee. Indeed, even after all the shots had been fired, he managed to drive away and to continue driving until he crashed. This would be a different case if petitioners had initiated a second round of shots after an initial round had clearly incapacitated Rickard and had ended any threat of continued flight, or if Rickard had clearly given himself up. But that is not what happened.[105]

The facts of this case demonstrate that, throughout the incident, Campbell never stopped the vehicle or gave himself up. In this moment in time, the officers could not know at what point Campbell was hit; thus, they continued shooting until the vehicle came to a stop. The Court finds that the officers' shooting at the vehicle until it came to a stop was not unreasonable under the circumstances of this case.

### g. Jurisprudence

The facts of this case are similar to those in *Sanchez v. Edwards*,[106] wherein the Fifth Circuit considered an appeal of summary judgment granted in favor of police officers who shot a suspect who refused to exit his vehicle and instead accelerated his vehicle in the direction of one of the officers. Several police officers were conducting a surveillance

---

[104] *Id.* at 777.
[105] *Id.*
[106] 433 Fed. Appx. 272 (5th Cir. 2011).
50052

operation of a residence for suspected drug activity.[107]  The officers began searching the premises for drugs and questioning individuals who approached the residence.[108] Sanchez pulled into the driveway of the residence in a Toyota Camry, and two officers approached the vehicle.[109]  Both officers were wearing clothing that identified them as law enforcement.  The officers identified themselves as police and verbally ordered Sanchez to stop the vehicle; however, Sanchez reversed into the street despite officers' continued orders to stop.[110]

One officer followed the car on the driver's side, and the other officer crossed in front of the car; however, while the officer was positioned directly in front of the vehicle, Sanchez then accelerated in his direction.[111]  Witnesses in the neighboring yards heard the officers shouting at Sanchez to stop and heard spinning tires on the gravel driveway.[112]  As the vehicle accelerated towards the officer, both officers fired their weapons at Sanchez.[113]  The vehicle struck one of the officers and continued down the road, eventually coming to a stop in a ditch.[114]  Sanchez was hit by three of the shots fired and pronounced dead at the scene.[115]

Sanchez's family filed a Section 1983 action against the officer alleging they violated Sanchez's right to be free from excessive force.  The district court granted summary judgment in favor of the officers, and the family appealed.  The officers asserted

---

[107] *Id.* at 273.
[108] *Id.*
[109] *Id.*
[110] *Id.*
[111] *Id.*
[112] *Id.* at 273-74.
[113] *Id.* at 274.
[114] *Id.*
[115] *Id.*

50052

the defense of qualified immunity on appeal.[116] However, because the court concluded

that Sanchez's constitutional rights were not violated, the court did not reach the issue of

qualified immunity.[117] The Fifth Circuit stated:

> "The use of deadly force for apprehension is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Hathaway v. Bazany*, 507 F.3d 312, 320 (5th Cir.2007) (citing *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). In *Garner,* the Supreme Court defined the circumstances under which an officer's use of deadly force to stop a fleeing suspect is constitutionally reasonable:
>
>> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.
>
> 471 U.S. at 11–12, 105 S.Ct. 1694. "The reasonableness of an officer's use of deadly force is therefore determined by the existence of a credible, serious threat to the physical safety of the officer or to those in the vicinity." *Hathaway*, 507 F.3d at 320. In making this determination, we must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).[118]

The court discussed its previous decision in *Hathaway v. Bazany*, which it noted

contained "facts that are legally indistinguishable from the facts of this case."[119]

> In *Hathaway v. Bazany*, we applied the Garner standard to facts that are legally indistinguishable from the facts in this case. *See* 507 F.3d at 315–16. In Hathaway, a police officer stopped a vehicle in order to investigate a gang-related altercation in the area. *Id.* at 315. When the officer, who was on foot, was approximately eight-to-ten feet from the front right corner of the

---

[116] *Id.*
[117] *Id.*
[118] *Id.* at 274-75.
[119] *Id.* at 275.
50052

vehicle, the vehicle suddenly accelerated towards him. *Id.* at 316. He attempted to get out of the way, but when he realized that he would not be able to do so, he decided to fire his weapon. Id. The vehicle struck the officer on the left leg, and the officer fired his weapon, although he could not recall whether he fired it before, during, or immediately after he was struck by the vehicle. *Id.* The shot hit the driver of the vehicle and killed him. *Id.*

On these facts, we held that the officer's use of deadly force was justified even though he could not specifically recall when he fired his weapon. *See id.* at 321–22. In doing so, we surveyed the relevant case law and identified two "central" factors in the reasonableness inquiry in these kinds of cases: (1) "the limited time [an] officer[ ] ha[s] to respond" to the threat from the vehicle; and (2) " 'the closeness of the officer[ ] to the projected path of [the] vehicle.'" *Id.* at 321 (quoting *Waterman v. Batton*, 393 F.3d 471, 479 (4th Cir.2005)) (final alteration in *Hathaway*). Given the officer's "close proximity" to the vehicle and the "extremely brief period of time" in which he had to react to the vehicle's movement towards him, we found that the officer was objectively reasonable in his perception of a threat of serious physical harm to himself and in his decision to respond to that threat with deadly force. *Id.* at 322.

Based on the same reasoning and analysis in *Hathaway*, the *Sanchez* court held that the officers acted reasonably in their use of deadly force on Sanchez.[120]  The court held:

Like the officer in *Hathaway*, Banquer and Schwebel had to take action quickly and decisively in response to an oncoming vehicle that was threatening an officer's safety. Sanchez ignored numerous commands from the officers to bring his vehicle to a stop. Both Banquer and Schwebel, who were the only eyewitnesses to the shooting, testified that Banquer was in front of Sanchez's Camry when Sanchez put the car into drive and drove forward. Because of the short period of time in which the officers had to react to Sanchez's abrupt change of direction and Banquer's obvious peril given his position in front of the vehicle, we have absolutely no trouble finding that the officer's decision to use deadly force was reasonable under the circumstances.[121]

The Court acknowledges that the case at bar involves more eyewitnesses to the incident and conflicting testimony regarding the officers' clothing and whether Brad Ware fell or was struck by the vehicle.  However, the Court has already addressed these

---

[120] *Id.*
[121] *Id.*
50052

conflicts and determined that these disputed facts are either immaterial to the issue at hand or, in the case of the police officers' clothing, blatantly contradicted by the stipulated photographs in the record. Thus, for the same reasoning and analysis given by the Fifth Circuit in both *Sanchez* and *Hathaway*, the Court finds no constitutional violation in this case.

Accordingly, for the reasons set forth above, the Court finds that Plaintiff has failed to present summary judgment evidence demonstrating genuine issues of material fact regarding the reasonableness of the force used by the Defendants under the circumstances. Defendants are entitled to summary judgment on Plaintiff's excessive force claim. In the alternative, the Court finds that the individual Defendants are shielded by qualified immunity, as set forth below.

### 2.    Qualified Immunity

All Defendants sued in their individual capacities argue that they are entitled to qualified immunity. Qualified immunity shields government officials from liability in their performance of discretionary functions unless their conduct violated a clearly established constitutional right.[122] "Once raised, a plaintiff has the burden to rebut the qualified immunity defense... We do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs."[123]

The qualified immunity defense presents a two-part inquiry: "(1) whether the facts alleged or shown by the plaintiff made out a violation of a constitutional right, and (2) whether that right was 'clearly established' at the time of the defendant's alleged

---

[122] *See Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009).
[123] *Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 380 (5th Cir. 2005).
50052

misconduct."[124]   A court may address either part of the two-part inquiry first.[125]   "This inquiry focuses not on the general standard—when may an officer use deadly force against a suspect?—but on the specific circumstances of the incident—could an officer have reasonably interpreted the law to conclude that the perceived threat posed by the suspect was sufficient to justify deadly force?"[126]

In *Brosseau v. Haugen*,[127] a Supreme Court decision reached five years before the incident before the Court, a police officer (Brosseau) responded to reports of a fight in a residential neighborhood. Haugen ran to hide from Brosseau, and several officers searched for him. When the officers saw Haugen, he jumped into his Jeep, and Brosseau believed he was looking for a weapon. She pointed her gun at Haugen and ordered him to exit the car, but he ignored her and they scuffled for the keys.[128]   He started the car, the officer jumped back, then she shot Haugen in the back through the rear driver's side window.[129]   The Court of Appeals for the Ninth Circuit reversed the district court's grant of summary judgment, holding that the Fourth Amendment had been violated and that Haugen's rights were clearly established.  The Supreme Court did not decide whether the shooting was unconstitutional; rather, it held that Brosseau was entitled to qualified immunity.  Because cases with similar factual patterns had yielded different results, this case was at the "hazy border between excessive and acceptable force."[130]

---

[124] *Ontiveros*, 564 F.3d at 382.
[125] *See Pearson v. Callahan*, 555 U.S. 223 (2009).
[126] *Ontiveros*, 564 F.3d at 383 n.1.
[127] 543 U.S. 194 (2004).
[128] *Id.* at 196.
[129] *Id.* at 196–97.
[130] *Id.* at 201 (quotation marks omitted).

50052

In the present case, Defendants were on the scene to execute a search warrant that included Campbell's vehicle. The uncontroverted evidence demonstrates that Campbell reached behind his seat after failing to comply with orders to exit the vehicle. Further, Campbell actively fled the scene, without consideration to the officers and innocent bystanders in the area, before Defendants opened fire. Plaintiff has not met his burden of demonstrating that, at the time that the events in this case occurred, "adequate authority at a sufficiently high level of specificity [ ] put [the Defendants] on notice that [their] conduct [was] definitively unlawful."[131] As such, the individual Defendants are entitled to qualified immunity.

Even if Plaintiff could establish a constitutional violation, the Court finds that the officers' conduct was objectively reasonable for purposes of qualified immunity for the same reasoning and analysis set forth above in the Court's finding that the excessive force was reasonable. The question here is whether the officers perceived that the threat posed by Campbell was sufficient to justify deadly force. That the officers' perceptions may have later been found to be incorrect – for example, if Brad Ware was not struck by the vehicle but simply fell near the bushes[132] – is not the question. The uncontroverted evidence establishes that the officers heard "officer down" after seeing Campbell accelerate his vehicle in the direction of Deputy Ware; thus, considering Campbell's refusal to obey orders, reaching behind his seat, attempt to flee the premises, and

---

[131] *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015); *see also Thompson v. Upshur Cnty., Tex.*, 245 F.3d 460 (5th Cir. 2001)("[I]t is the plaintiff's burden to demonstrate that all reasonable officials similarly situated would have then known that the alleged acts of the defendants violated the United States Constitution.").
[132] The Court is not making a finding of fact.
50052

possible intent to run over Deputy Ware, the Court finds that the officers' decision to open fire at that point was reasonable under the circumstances.

It is also relevant that, in addition to several law enforcement officers in the yard, there were numerous bystanders in neighboring yards watching this incident. The officers' actions are also reasonable in light of their obligation to protect innocent bystanders from Campbell's conduct. While this case does not involve a lengthy, high-speed car chase, it was reasonable for officers to conclude that Campbell's erratic driving and acceleration in the direction of an officer constituted a danger to all officers in the yard and innocent bystanders. The photographic evidence of the residence demonstrates the small size of the yard and the close proximity to neighboring houses and yards.[133]

In *Plumhoff v. Rickard*,[134] the Supreme Court found that police officers did not violate the Fourth Amendment by fatally shooting a suspect after a high-speed chase because "during the 10-second span when all the shots were fired, [the suspect] never abandoned his attempt to flee."[135] The suspect had led the police on a chase that "exceeded 100 miles per hour and lasted over five minutes."[136] The suspect's car then collided with a police car and came to a standstill for three seconds.[137] Then, the suspect pushed down on the accelerator so that his tires spun, managed to break free from the police car with which he had collided, "threw the car into reverse," and drove away.[138] The officers fired three shots while the suspect was trying to break free and twelve more

---

[133] Exhibit E(1) at 779-850.
[134] 572 U.S. 765 (2014).
[135] *Id.* at 766.
[136] *Id.* at 776.
[137] *Id.*
[138] *Id.*

50052

shots as he drove away.[139]  The Court found that "all that a reasonable police officer could have concluded was that ... [the suspect] would once again pose a deadly threat for others on the road."[140]  Thus, the police officers were justified in firing at the suspect and were not required to cease firing until the threat had ended.[141]

For the reasons set forth above, the Court finds in the alternative that, had Plaintiff demonstrated excessive force in violation of the Constitution, the individual Defendants would nevertheless be shielded by the defense of qualified immunity.

### 3.  Fourteenth Amendment Claims – Due Process/Equal Protection

Plaintiff has also asserted claims that his Fourteenth Amendment rights of due process, life and liberty, and equal protection were violated by the Defendants.[142] Defendants have moved for summary judgment on these claims.

"The Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing its power [] or employing it as an instrument of oppression."[143] Its substantive component "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them."[144]  However, it "does not transform every tort committed by a state actor into a constitutional violation."[145] "[T]he substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'"[146]

---

[139] *Id.* at 765.
[140] *Id.* at 777.
[141] *Id.*
[142] Rec. Doc. No. 1 at 6.
[143] *Collins v. City Harker Heights, Tex.*, 503 U.S. 115 (1992) (internal quotation omitted).
[144] *Id.* at 125 (internal citations and quotations omitted).
[145] *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 201 (1989).
[146] *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (quoting *Collins*, 503 U.S. at 128).
50052

A plaintiff may bring a substantive "due process" claim under the Fourteenth Amendment only if the claim alleged is not susceptible to proper analysis under a specific constitutional source.[147] Consequently, if the Fourth Amendment applies to the Plaintiff's excessive force claim, then his substantive "due process" claim is precluded.[148] This determination hinges on whether the Defendants intentionally fired their weapons. It is undisputed that the officers intentionally fired their weapons at Campbell's vehicle; therefore, the Court may not entertain the Plaintiff's Fourteenth Amendment "substantive due process" claim because the Fourth Amendment will appropriately apply.[149]

As Plaintiff has asserted an excessive force claim under the Fourth Amendment, Plaintiff's Fourteenth Amendment due process claim is not viable. Furthermore, Plaintiff's focus in his *Opposition* is almost entirely on the excessive force claim. Indeed, the words "due process" do not appear in his brief. Plaintiff's conflates his constitutional claims under both the Fourth and Fourteenth Amendments; however, this ignores the jurisprudence set forth above that demonstrates different standards for these claims. Plaintiff's only argument regarding his Fourteenth Amendment claims is: "In a light most favorable to the plaintiff, a reasonable jury could come to the determination that the officers' actions were not reasonable under the 4th and 14th Amendments."[150] However, as set forth above, reasonableness is not the standard for the Fourteenth Amendment due process claim. As such, Plaintiff has failed to offer substantive arguments or

---

[147] *See Petta v. Rivera*, 143 F.3d 895, 901 (5th Cir.1998) (citing *Lewis*, 523 U.S. at 843); *see also Graham*, 490 U.S. at 395 ("where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that [a]mendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims").
[148] *See Petta*, 143 F.3d at 901.
[149] *See Roe v. Tex. Dept. of Protective & Regulatory Servs.*, 299 F.3d 395, 411 (5th Cir. 2002) (citing *Albright v. Oliver*, 510 U.S. 266 (1994) (plurality)).
[150] Rec. Doc. No. 118 at 9.

50052

evidence in opposition to Defendants' motion on his Fourteenth Amendment claims, and Defendants are entitled to summary judgment on Plaintiff's Fourteenth Amendment claims.[151]

### C. Official Capacity *Monell*[152] claims

Since the filing of this motion, the official capacity claims asserted against Cormier, Stelly, Boddye, Brad Ware, and Credeur have been dismissed.[153] The only remaining *Monell* claims are asserted against the City of Rayne and Sheriff Melancon. Because Plaintiff has failed to establish an underlying constitutional violation, the municipal Defendants cannot be held liable under *Monell*.

The Fifth Circuit has held that a municipality is not liable when its employee did not commit a constitutional violation.[154] In *Rios v. City of Del Rio*, the Fifth Circuit upheld the dismissal of the plaintiff's claims against the defendant police chief who had supervised the defendant officer.[155] The plaintiff, a border guard who had been struck by a prisoner

---

[151] The Parties did not address Plaintiff's equal protection claim; however, upon review of Plaintiff's *Complaint*, the Plaintiff has alleged no facts to support an equal protection claim. The Fourteenth Amendment's Equal Protection Clause states that "no state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. This Clause directs that similarly situated persons should be treated alike. *See Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). Generally, "to state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." *Johnson v. Morel*, 876 F.2d 477, 479 (1989). Generally, cases involving the Equal Protection Clause are "concerned with governmental classifications that affect some groups of citizens differently than others." *Engquist v. Or. Dept. of Agric.*, 553 U.S. 591, 601, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008). Plaintiff herein has not alleged that he or his son suffered intentional discrimination based on his membership in a protected class. Moreover, there is no summary judgment evidence in this voluminous record that supports such a claim. Accordingly, summary judgment also applies to Plaintiff's purported equal protection claim.

[152] *Monell v. Dept. of Social Serv.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

[153] Rec. Doc. Nos. 130 & 132.

[154] *See Alpha v. Hooper*, 440 F.3d 670, 672 (5th Cir. 2006) (upholding summary judgment for the defendant county because the defendant officer, who shot and killed the plaintiff, did not use excessive force); *Mace v. City of Palestine*, 333 F.3d 621, 625 (5th Cir. 2003) (same); *Thomas v. Murray*, 251 F.3d 156 (5th Cir. 2001) (holding that, because defendant police officer did not use excessive force or unlawfully detain the plaintiff, the defendant county was entitled to summary judgment on plaintiff's ratification claim).

[155] 444 F.3d 417 (5th Cir. 2006).

50052

driving a stolen police car, asserted that the officer had violated his Fourteenth Amendment right to be free from state deprivation of his bodily integrity liberty interest. The Fifth Circuit found that no such violation occurred. Turning to the plaintiff's claims against the police chief, the court stated that "[a] plaintiff must show either the supervisor personally was involved in the constitutional violation or that there is a sufficient causal connection between the supervisor's conduct and the constitutional violation."[156] "It is facially evident that this test cannot be met if there is no underlying constitutional violation."[157] The *Rios* court also noted that, in *Collins v. City of Harker Heights*, the Supreme Court stated that, "if a city employee violates another's constitutional rights, the city may be liable if it had a policy or custom of failing to train its employees and that failure to train caused the constitutional violation."[158]

Because the Court has already found that the use of force by the Defendants was reasonable, and therefore not in violation of the Fourth Amendment, it follows that the City of Rayne and Sheriff Melancon are also not liable for the use of force or its purported failure to properly train the officers. Accordingly, summary judgment is granted in favor of the City of Rayne and Sheriff Melancon.

### D.  State Law Claims[159]

Plaintiff has asserted state law claims of excessive force, negligence, and vicarious liability.  Plaintiff states: "At their core, the plaintiff's underlying state law claims against

---

[156] *Id.* at 425 (quoting *Evett v. DETNTFF*, 330 F.3d 681, 689 (5th Cir. 2003)).

[157] *Id.* (citing *Breaux v. City of Garland*, 205 F.3d 150, 161 (5th Cir. 2000)).

[158] *Id.* at 426 n. 11 (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261, (1992) (emphasis added by the *Rios* court).

[159] The Court exercises supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

50052

the specific officers involved in this shooting hinge on the same reasonableness issues that plague the defendants' plea for summary judgment on the constitutional issues. The analysis for the claims are [sic] similar, and for the reasons asserted above in the analysis of the constitutional claims and the Qualified Immunity claims, the Court should deny the defendants' Motion for Summary Judgment on the state law claims."[160]

Plaintiff is correct as to the excessive force claim. "Excessive force claims under Louisiana law are analyzed with the same standard that is used to gauge excessive force claims under Section 1983.[161] That is, as in the qualified immunity context, the actions of the Defendants, when considered under state law, must be judged for objective reasonableness."[162] The Court has already determined that the Defendants herein did not use excessive force and therefore acted in an objectively reasonable manner and are alternatively entitled to qualified immunity from Plaintiff's federal claims against them in their individual capacities. For the same reasons, the Plaintiff's state law claims are without merit and must be dismissed.

Turning to the state law negligence claim, Plaintiff has not addressed any of the elements of this claim and instead simply argues that his state law claims should survive summary judgment based on the same "reasonableness issues" as discussed regarding

---

[160] Rec. Doc. No. 118 at 12.

[161] *Adams v. Glaser*, 138 F.Supp.3d 727, 741 (E.D. La. 2015)(citing *Kyle v. City of New Orleans*, 353 So.2d 969, 972–73 (La. 1977) ("The use of force by law enforcement must be tested by the 'reasonable force' standard."); *Deville*, 567 F.3d at 172–73 ("Louisiana's excessive force tort mirrors its federal constitutional counterpart. 'The use of force when necessary to make an arrest is a legitimate police function. But if the officers use unreasonable or excessive force, they and their employer are liable for any injuries which result.'"); *Winston v. City of Shreveport*, 390 Fed. Appx. 379, 385–86 (5th Cir. 2010) ("Under Louisiana law, we apply the same 'reasonableness' standard to Winston's state law claims of false arrest and excessive force that we apply when analyzing whether qualified immunity shield Officer Willis against Winston's federal constitutional claims.")).

[162] *Id.*

50052

his federal claims. While it is correct that the question of whether a duty was breached considers the reasonableness of the action taken,[163] Plaintiff is not relieved of his burden of establishing all five elements of his negligence claim. Plaintiff's *Complaint* did not allege a duty, breach, or causation, and Plaintiff has not argued these elements or directed the Court to the summary judgment evidence that establishes genuine facts issues in this case. Nevertheless, the Court finds that Plaintiff's negligence claim fails on the "reasonableness issues."

Louisiana courts evaluate use of force with the duty/risk analysis applicable to negligence claims.[164] The duty/risk analysis consists of the following factors: (1) did the defendant owe a duty to the plaintiff; (2) was the duty breached; (3) was the conduct in question a substantial factor in bringing about the harm to the plaintiff, *i.e.*, was it a cause-in-fact of the harm which occurred; (4) was the risk, and harm caused, within the scope of protection afforded by the duty breached; and (5) actual damage.[165] For liability to be found, Plaintiff must prove all five separate factors.[166]

"Whether a duty is owed is a question of law."[167] Duties are imposed on governmental actors, such as police officers, based on the services performed or provided to the public.[168] The breach factor of the duty/risk analysis considers the reasonableness of the action taken.[169] Reasonableness is determined by examining the

---

[163] *See Westmoreland*, 771 So.2d at 717 (La.App. 3d Cir. 2000).
[164] *N.S. v. City of Alexandria*, 919 F.Supp.2d 773, 781 (citing *Mathieu v. Imperial Toy Corp.*, 646 So.2d 318, 321–22 (La. 1994)).
[165] *See Williams v. Domino's Pizza, Inc.*, 2001 WL 6724, at *4 (E.D.La. Jan. 2, 2001); *Roberts v. Benoit*, 605 So.2d 1032, 1041 (La.1991); *see also Wiltz v. Bayer CropScience, Ltd. P'ship*, 645 F.3d 690, 698 (5th Cir. 2011).
[166] *Mathieu*, 646 So.2d at 322.
[167] *Hardy v. Bowie*, 744 So.2d 606, 614 (La. 1999).
[168] *See Smith v. Lafayette Parish Sheriff's Dept.*, 874 So.2d 863, 869 (La.App. 3d Cir. 2004).
[169] *Westmoreland v. City of Natchitoches*, 771 So.2d 715, 717 (La.App. 3d Cir. 2000).

50052

totality of the circumstances.[170]  The Louisiana Supreme Court has listed the following factors to consider in determining whether a police officer used reasonable force: "the known character of the arrestee, the risks and dangers faced by the officers, the nature of the offense involved, the chance of the arrestee's escape if the particular means are not employed, the existence of alternative methods of arrest, the physical size, strength, and weaponry of the officers as compared to the arrestee, and the exigencies of the moment."[171]  As the Court has previously considered these factors and concluded that the officers acted reasonably under the circumstances of this case, the Court need not consider the remaining factors in this analysis.

Plaintiff has failed to establish his state law claims as to the police officers; thus, his claim of vicarious liability against the municipalities and supervisory officials also fails. Accordingly, Defendants' *Motion for Summary Judgment* is granted as to Plaintiff's state law claims of excessive force, negligence, and vicarious liability.

Plaintiff has asserted a bystander claim for his own alleged injuries that occurred due to witnessing the shooting of his son.  Plaintiff claims that he has suffered mental anguish and/or emotional distress and that he suffered a heart attack just hours after witnessing the shooting.  In his *Opposition*, Plaintiff essentially concedes that, if there is no liability for the underlying actions, there can be no bystander liability.  Plaintiff does not offer any argument or evidence for the substance of this claim; rather, he argues only that "[i]f the Court makes the determination that the officers are liable for the constitutional claims, then the defense has done absolutely nothing to carry their burden for Summary

---

[170] *Kyle v. City of New Orleans*, 353 So.2d 969, 973 (La.1977).
[171] *Id.* at 973.
50052

Judgment on these claims. Therefore, the analysis on this claim is based solely on the Court's determination of the other claims in this lawsuit."[172]

Louisiana jurisprudence supports Defendants' argument that Plaintiff's bystander claims are foreclosed by a finding of no liability on the underlying constitutional claims. In *Williams v. East Baton Rouge Parish School Board*, a father who saw his son injured during a football game was denied recovery under La. C.C. art. 2315.6 from the defendant school board and high schools because they were found to be not liable for the son's injuries.[173] The court in *Jenkins v. Willis Knighton Medical Center* relied on the *Williams* case in denying bystander claims of the family members of a patient who suffered a stroke and ultimately died the next day while being treated in the emergency room.[174] The plaintiffs had sued the hospital for medical malpractice and asserted bystander claims under La. C.C. art. 2315.6. The court granted summary judgment on the bystander claims because it found that the hospital was not liable for the patient's medical condition.[175] Accordingly, Plaintiff's bystander claim fails as a matter of law.

Alternatively, Plaintiff's bystander claim would also fail on the merits. In Louisiana, to sustain a bystander claim, "a plaintiff must establish: (1) that he or she 'view[ed] an event causing injury to another person, or ... [came] upon the scene soon thereafter'; (2) a sufficiently close relationship to the direct victim as defined by the relevant code article; (3) that 'the injured person ... suffer[ed] such harm that one can reasonably expect a person in the claimant's position to suffer serious mental anguish or emotional distress

---

[172] Rec. Doc. No. 118 at 13.
[173] 1997–2645 (La.App. 1st Cir.12/28/98), 723 So.2d 1093.
[174] 43,254 (La.App. 2 Cir. 6/4/08), 986 So.2d 247.
[175] *Id.* at 253.

50052

from the experience'; and (4) 'the claimant's mental anguish or emotional distress must be severe, debilitating, and foreseeable.'"[176] "A non-exhaustive list of examples of serious emotional distress includes neuroses, psychoses, chronic depression, phobia, and shock."[177] "The emotional distress sustained must be both serious and reasonably foreseeable to allow recovery. Serious emotional distress, of course, goes well beyond simple mental pain and anguish. Compensation for mental pain and anguish over injury to a third person should only be allowed where the emotional injury is both severe and debilitating."[178]

Although Plaintiff has not argued or addressed these elements, there is sufficient evidence in the record satisfying the first three elements listed above. However, there appears to be no summary judgment evidence before the Court, and Plaintiff has not directed the Court to any such evidence, establishing that Plaintiff's mental anguish/emotional distress was "severe, debilitating, and foreseeable." Had this Court found that Defendants were liable on the underlying claims in this matter, Plaintiff's bystander claim would still fail on the merits as Plaintiff has not carried his burden in establishing all four elements required by Louisiana law.

Accordingly, the Defendants are entitled to summary judgment on Plaintiff's bystander claims.

---

[176] *Curran v. Aleshire*, 67 F.Supp.3d 741, 768 (quoting La. C.C. art. 2315.6.).
[177] *Jenkins*, 986 So.2d at 252-53 (citing Lejeune, supra; *Norred v. Radisson Hotel Corporation*, 950748 (La.App. 1st Cir.12/15/95), 665 So.2d 753).
[178] *Nelson v. Ruston Longleaf Nurse Care Center, Inc.*, 32,718 (La. App. 2 Cir. 2/1/00), 751 So.2d 436, 438.
50052

### III. CONCLUSION

For the reasons set forth above, the Court finds that there are no genuine issues of material fact that preclude summary judgment, and Defendants' *Motion for Summary Judgment*[179] is GRANTED.  Plaintiff's claims are dismissed with prejudice.

*Judgment* shall be entered accordingly.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on March 11, 2019.


_____
**CHIEF JUDGE SHELLY D. DICK
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA**

---

[179] Rec. Doc. No. 116.

50052